UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| Dr. Nicolas Valcik, Ph.D., § <br> Plaintiff, § <br> §    CIVIL ACTION NO. 24-CV-86 <br> vs. § <br> § <br> Texas Tech University, § <br>         Defendant § | |

### PLAINTIFF NICOLAS VALCIK, PH.D.'s ORIGINAL COMPLAINT

Plaintiff Nicolas Valcik, Ph.D., by his attorney, files this his Original Complaint against Defendant Texas Tech University, alleging as follows:

### I.    JURISDICTION AND VENUE

1. This action arises under the Federal False Claims Act (31 U.S.C. § 3730(h)(1)). Accordingly, this Court has Federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331.

2. This Court has personal jurisdiction over Defendant as it is a state educational institution located predominantly within Lubbock County within this District and Lubbock Division. Defendant has waived sovereign immunity because it has accepted Federal funds for educational purposes.

3. Venue is appropriate in the Northern District of Texas pursuant to 28 U.S.C. Section 1391(b)(1 and 2), and this matter is properly in the Lubbock Division, Texas Tech University is headquartered in Lubbock, Texas and because a substantial portion of the acts or omissions that form the basis of this action occurred at the portion of Texas Tech University that is located in Lubbock County, within the Lubbock Division of the Northern District of Texas.

## II.     THE PARTIES

4.     Plaintiff **Dr. Nicolas Valcik, Ph.D.** ("Valcik") is a former employee of the Defendant and is a citizen of the United States and of the State of Texas.

5.     Defendant **Texas Tech University** is a Texas state educational institution that receives federal funds.

## III.     THE FACTUAL BACKGROUND OF THE ACTION

6.     Dr. Valcik was employed by TTU as Managing Director of Institutional Research from September 1, 2020, until April 11, 2022.

7.     In this role he was responsible for reporting information necessary for state and federal funding, including Title IV Federal funding. As such, he had a duty under state and Federal law, including the Federal False Claims Act, to ensure the data used to secure and maintain these Federal and state funds was accurate, and that fraudulent or false information was not being used to fraudulently obtain Federal or state governmental funds. However, it was his efforts to ensure that the data used to obtain these funds was corrected that resulted in his unlawful termination.

8.     Specifically, Dr. Valcik had discovered that the faculty data in the CBM008 Official Files and the IPEDS HR Staff reports had errors, which had to be reported for state (compliance linked to the CBM0E1, CBM004 as well as THECB Cost Study) and Federal funding (Title IV for IPEDS). In short, Dr. Valcik wanted to update the information on the unofficial dashboards, but he was told not to because the President was already using those numbers publicly. In other words, use false data internally on the dashboards reflected erroneous faculty data that differed with IPEDS HR and CBM008 officially reported false information because it would be internally or externally embarrassing to explain to the President or the public

that the numbers he has been using were false. In other words, Texas Tech's administrators preferred to defraud the government moving forward than to admit to the President or the public that the University's data needed updating.

9. Despite the fact that Dr. Valcik had a legal duty to update the official files being presented to both state and Federal entities, he was terminated because he had the audacity to want the data provided to the Department of Education to obtain Title IV funds to be accurate even if updating the data caused a little embarrassment.

10. However, IPEDS files had been incorrectly reported to the Department of Education prior to Dr. Valcik's hire and likely would have been used to falsely seek Title IV funding in the future. Accordingly, Dr. Valcik's attempts were designed to prevent a fraudulent Federal grant filing, and thus were "protected activity" under the Federal False Claims Act. The Fact that his supervisors may have been embarrassed by the need for an update or disagreed with that need does not transmogrify Dr. Valcik's good faith report into unprotected activity.

11. One reason that Dr. Valcik was fired was because he had informed his superiors that the IPEDS information was inaccurate and that he was terminated, in whole or in part, because correcting the IPEDS information, which was required by the Federal government for Title IV money, was considered problematic by TTU.

### IV.   LEGAL and FACTUAL BACKGROUND

**A.   False Claims Act Whistleblowing**

12. Known as "Lincoln's Law," the False Claims Act (FCA) was enacted during the Civil War to counter widespread fraud by contractors supplying the military. The FCA provides robust protection against retaliation. Specifically, at 31 U.S.C. Section 3730(h)(1), the FCA provides:

> Any employee, … shall be entitled to all relief …, if that employee, … is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against …, because of lawful acts done by the employee … in furtherance of … efforts to stop 1 or more violations of this subchapter.

*See* 31 U.S.C. § 3730(h)(1). (emphasis added by removal of superfluous language).

13. Unlike the False Claims Act an individual may seek a recovery on behalf of the United States by filing a Qui Tam Action (which is a claim made pursuant to 31 U.S.C. § 3729 through the procedural requirements of §3730 (b)). In contrast, a claim made pursuant to Section 3730(h) (2) of the False Claims Act is a claim for unlawful retaliation, including wrongful termination.

14. The purpose of Section 3730(h) (2) of the False Claims Act is to prevent the need for a False Claims Act Qui Tam action by creating whistleblower protections to establish the conditions where false claims are less likely to occur. Accordingly, there is no administrative prerequisite for filing a claim with the United States government. *See, e.g., Tibor v. Michigan Orthopedic Institute*, 72 F.Supp.3d 750, 756-57 (E.D. MI 2014).

1. **FCA Cases Related to Educational Fraud**

15. The Federal False Claims Act seeks to stop many types of governmental fraud including factually fraudulent claims and legally fraudulent claims. A factually fraudulent claim is one where the product sold is not provided or overbilled *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996). The False Claims Act, however, is not limited to such facially false or fraudulent claims for payment. *See id.* Rather, the False Claims Act is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert–White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968).

16. Legal fraud, however, occurs when an entity that is receiving governmental support makes a false representation related to the receipt of those government funds that only can be billed because the entity receiving the funds has qualified through making representations to the Federal government.

17. Legal Fraud is divided into two types of false certification false fraud: (a) express certification; and (2) implied false certification.

18. The express false certification theory applies when a defendant falsely certifies that it complied with a statute, regulation, or other legal requirement, where compliance with that requirement is a prerequisite to payment. Indeed, the Fifth Circuit has long held that "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *See, U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (denying motion to dismiss because plaintiff alleged that certain Medicare payments required annual certification requirements).

19. Under the implied false certification theory, even if a defendant does not expressly certify that it complied with a requirement that is considered a condition of payment, a defendant can still be liable if (1) the defendant requests payment and "makes specific representations about the goods or services provided;" and (2) "[t]he defendant's failure to disclose noncompliance with material statutory, regulatory or contractual requirements makes those representations misleading half-truths." See U*niversal Health Services, Inc. v. U.S. ex rel. Escobar,* 579 U.S. 176 *(*2016). The Supreme Court thus held that the implied certification theory can be the basis for FCA liability when a defendant submitting claims makes specific

representations about the goods or services provided," but fails to disclose noncompliance with *material* statutory, regulatory or contractual requirements that make those representations misleading." Id.

20. Such is the case for Dr. Valcik and Texas Tech. Indeed, Dr. Valcik was complaining that the data in Texas Tech's IPEDS database was materially false. According to the Department of Education, this is not a minor item, but a material infraction that can lead to loss of funding:

> The completion of all IPEDS surveys is mandatory for institutions that participate in or are applicants for participation in any Federal student financial aid program (such as Pell grants and Federal student loans) authorized by Title IV of the Higher Education Act of 1965, as amended (20 USC 1094, Section 487 (a) (17) and 34 CFR 668.14 (b) (19)).
> …
> Title IV, HEA program regulations 34 CFR 668.84, 668.85, and 668.86 provide that the Department may initiate a fine action or other administrative action, such as a limitation, suspension, or termination of eligibility to participate in the Title IV, HEA programs, against institutions that do not comply with the requirement to complete and submit their IPEDS surveys.

*See,* Statutory Requirements for Reporting IPEDS Data, U.S. Department of Education, National Center for Education Statistics, available at https://surveys.nces.ed.gov/ipeds/public/statutory-requirement, accessed on February 18, 2023.

### 2. Texas Tech Knew or Should Have Known that Dr. Valcik's Actions were Protected Activity Under the Federal False Claims Act

21. The Fifth Circuit recognizes internal complaints that "concern false or fraudulent claims for payment submitted to the government" as protected activity under the FCA but requires that the complaints in question raise concerns about fraud. *See Patton*, 418 Fed.Appx. at 372 (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir.1994)).

22. The Southern District of Texas has clarified that the FCA anti-retaliation whistleblower provision can be triggered "by making internal reports that alert the employer to

fraudulent or illegal conduct." *U.S. ex. Rel George*, 864 F. Supp 2d 597, 606 (S.D. Tex. 2012), citing *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010). In this case, Plaintiff alerted his employer through multiple internal reports of fraudulent and/or illegal conduct by the spending of ARPA funds without a proper bidding process in violation of Federal and state procurement law.

23. The FCA's scope of protection against retaliation is generally governed by the "distinct possibility" standard under which the "employee need not 'have filed an FCA lawsuit or ... have developed a winning claim at the time of the alleged retaliation.'" *See Miniex v. Houston Housing Authority*, 400 F.Supp.3d 620, 640-41 (S.D. Texas), citing *U.S. ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 604-05 (S.D. Tex. 2012) (quoting *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.,* 360 F.3d 220, 236 (1st Cir. 2004)). In this case, there was a distinct possibility that by the spending of ARPA funds without a proper bidding process Defendant was in violation of Federal and state procurement law and violating ARPA.

24. Accordingly, for a state employee to satisfy this standard, the employee's actions must be motivated by a "good faith" and objectively reasonable belief—i.e., "a reasonable employee in the same or similar circumstances might believe"—that her "employer is committing fraud against the [Federal] government." *See id.* at 605. *See also Thomas v. ITT Educ. Servs., Inc.*, 517 Fed.App'x 259, 263 (5th Cir. 2013) (per curiam) ("A protected activity is one motivated by a concern regarding fraud against the [Federal] government.").

25. A state governmental entity acting as an employer may be sued directly under the FCA related to its misuse of Federal funds. *See, e.g., Miniex v. City of Houston*, 400 F.Supp.3d 620 (S.D. Tex. 2019). In such a matter, the employee of a state agency states a valid FCA whistleblower claim if he or she has "a good faith and objectively reasonable belief that staff at

[the employee's state agency] could be continuing to commit fraud by misdirecting Federal funds." *See id.* at 641.

3. **An Employee Who Makes a "Good Faith Complaint" Cannot Be Terminated Merely Because the Employer Disagrees with the Veracity of the Complaint**

26.    The Fifth Circuit held over 40 years ago that the filing of a charge of discrimination and other communications with the EEOC are protected even if false. *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1003-1007 (5th Cir. 1969) (holding "[t]here can be no doubt about the purpose of § 704(a). In unmistakable language it is to protect the employee who utilizes the tools provided by Congress to protect his rights. The Act will be frustrated if the employer may unilaterally determine the truth or falsity of charges and take independent action.") (emphasis added).

27.    Other subsequent cases have reinforced the holding of the Fifth Circuit in *Pettaway* as to complaints other than the filing of a formal EEOC charge, including both opposition short of an investigation and participation in an investigation. *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130 (5th Cir. 1981) (employee who opposed racially discriminatory hiring practices need not prove veracity of such practices to receive protection of anti-retaliation provision); *Thomas v. Norris*, 2009 U.S. Dist. LEXIS 107447 (B.D. Tex. 2009) (same). Notably, *Thomas* holds that opposition to discriminatory practices requires only a reasonable belief and participation at best only a good faith belief. Id. at 28-29. Further, the dissent in *Holt v. v. JTM Indus.*, 89 F.3d 1224 (5th Cir. 1996), recognizes that the EEOC's anti-retaliation position, stated in Section 614.1 of its Interpretive Manual, explicitly relies on *Pettway* in declaring as follows:

> (A) General--Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, is intended to provide "exceptionally broad protection" for protestors of discriminatory employment practices. *See Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1004-1005, 2 EPD § 10,011 (5th Cir.1969).

28. In a case, like here where the employee was terminated after an internal complaint of was allegedly found to be unsupported by facts, the Fifth Circuit held that the employee was protected by anti-retaliation clause of a Federal employment rights law irrespective of his or her ability to prove the original complaint:

> [the Employee] need not prove that the discriminatory hiring practices alleged in her complaint in fact, existed. [He] need only prove that [he] had a "reasonable belief" that such practices existed in order to be protected by Title VII of the Civil Rights Act of 1964.
>
> *See De Anda v. St. Joseph Hosp.,* 671 F.2d 850, 853 n. 2 (5th Cir.1982), citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130 (5th Cir. 1981), and also citing *Berg v. La Crosse Cooler Co.,* 612 F.2d 1041, 1045–46 (7th Cir.1980) (employee who makes good faith, reasonable charges that employer's practice violates Title VII is protected from retaliatory discharge though charges later determined to be unfounded).

29. The *Berg* case, cited in *De Anda*, discusses its underlying legal analysis for why employees need not prove the veracity of their complaints to have protection from retaliation because to interpret the opposition clause to require such proof would undermine the ability of Title VII to allow employees to seek better workplaces short of litigation:

> [this argument] undermines Title VII's central purpose, the elimination of employment discrimination by informal means; destroys one of the chief means of achieving that purpose, the frank and nondisruptive exchange of ideas between employers and employees; and serves no redeeming statutory or policy purposes of its own. Section 2000e-3(a) plays a central role in effectuating these objectives. By protecting employees from retaliation, it is designed to encourage employees to call to their employers' attention discriminatory practices of which the employer may be unaware or which might result in protracted litigation to determine their legality if they are not voluntarily changed.

612 F.2d at 1045.

30. For further example, a district judge in New York has held specifically that even if an employer believes the complaint is false and malicious, it cannot escape a retaliation claim based on its own belief:

> If an employer were permitted to fire employees who protested alleged illegal discrimination, simply because the employer believed the complaints were unfounded or malicious, the employees' protection would be illusory. Employers could easily make false claims that they disbelieved in the employees' good faith. But it is not just a question of possible false defenses. Undoubtedly, many employers do in fact believe that employees' complaints of discrimination are completely without merit. But the law requires the employer to tolerate such complaints, and not to retaliate because of them.

*Sanders v. Madison Square Garden, L.P.*, 525 F. Supp. 2d 364 (S.D.N.Y. 2007), modifying on reconsideration but otherwise upholding *Sanders v. Madison Square Garden, L.P.*, 2007 U.S. Dist. LEXIS 57319 (S.D.N. Y. 2007).

31. The above case law prohibits firing an employer in retaliation for good faith whistleblowing applies to the Federal False Claims Act because it too uses a good faith standard for determining protected activity. *See Miniex*, 400 F.Supp. 3d at 646, *supra*. (affirming jury instruction that employee satisfies protected activity requirement by showing "the employee has a good faith, reasonable belief that the employer is committing fraud on the government.").

### 4. Even So, Dr. Valcik was Terminated Solely Because the Persons on Whom He Blew the Whistle Denied Wrongdoing

32. In this case, TTU admittedly fired Dr. Valcik merely because the people that he blew the whistle on claim that his blowing the whistle was inaccurate. Indeed, attached is the termination letter from the TTU EEOC office that expressly states:

> Rather, we note that you were terminated for a specific reason, which was neither discriminatory nor retaliatory. You were terminated because you represented that the Vice Provost for Institutional Effectiveness and the Associate Vice President for Information Technology had directed you to change data on the IR Dashboard. However, both denied giving you such directions, and both expressed concerns with your ability to report accurately or represent their interactions in an honest manner. As such, your termination was not in violation of TTUS Regulation 07.10.

33. While this letter was factually inaccurate, being 180 degrees off from reality, it does factually state that the reason for Dr. Valcik's termination was that he had the audacity to ensure that the data on the IR Dashboard was accurate. In other words, the people whom Dr. Valcik blew the whistle on deny the alleged wrongdoing.

34. Furthermore, the TTUS Office incorrectly stated that the Vice Provost for Institutional Effectiveness and the Associate Vice President for Information Technology had directed Dr. Valcik to change data on the IR Dashboard when the statement was in fact that Dr. Valcik was directed not to change the unofficial dashboards to reflect the official reports.

35. As the Fifth Circuit and other Federal cases above make clear, if whistleblowers could be fired because their bosses disagree with the whistle being blown on them, then whistleblowing law would cease to exist as an effective tool and would become a paper tiger.

36. Accordingly, unless a prompt settlement can be obtained for Dr. Valcik, he will bring a claim for wrongful termination under the Federal False Claims Act and otherwise seek to protect his legal rights to the fullest extent possible unless an acceptable severance agreement can be reached promptly.

**5. The Animus of the People Valcik Reported Is Pertinent Under the Cat's Paw Doctrine**

37. Additionally, in *Staub v. Proctor Hospital,* 562 U.S. 411, 131 S.Ct. 1186 (2011), the Supreme Court determined that an employer should be held liable for employment discrimination based on the discriminatory animus of an employee, who influenced, but did not make, the ultimate employment decision. This doctrine is commonly referred to as "Cat's Paw."

38. Cat's Paw theory applies to Federal employment rights cases, as evidenced in *Zamora v. City Of Houston*, 798 F.3d 326, 331-32 (5th Cir. 2015) (holding cat's paw analysis applies in Fifth Circuit to Title VII cases); and, *Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (holding a Title VII plaintiff can succeed "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [decision-making] process" (citation omitted).

39. Under the Cat's Paw analysis, "the impermissible bias of a single individual at any stage of the adverse employment event process may taint the ultimate employment decision ... so long as the individual shown to have the impermissible bias played a meaningful role" in the employment action. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999).

40. When a supervisor or manager takes actions motivated by retaliatory animus that are intended to cause an adverse employment action and do cause that action, this conduct is sufficient to allow the conclusion that the employment decision, even if made by a different actor, is tainted by the same illegal bias or motive. *Zamora*, 798 F.3d at 332 (holding evidence of supervisor's animus was sufficient to show other City actor's decision was illegal).

41. It is evident through his prima facie case for discrimination that Valcik experienced bias towards his reporting of fraud by the persons against whom he reported, and despite their knowledge of the false information, being aware of those practices, and having the need to hide their own misdeed, they false alleged that it was Valcik who committed the misconduct.

42. Valcik asserts that based on both Cat's Paw liability and/or general vicarious liability law, including under *Respondeat Superior* theory, that TTU is liable for the actions taken by its managers and employees acting with improper discriminatory or retaliatory animus.

43. An employer may be liable for intentional discrimination by an employee through *respondeat superior,* or vicarious liability. *See Green v. Albertson's, Inc.,* 67 Fed.Appx. 248 (5th Cir 2003), citing *Arguello v. Conoco, Inc.,* 207 F.3d 803, 810 (5th Cir.2000) (discussing 42 U.S.C. §§ 1981, 1982, and 2000a).

44. The FCA's whistleblower provision protects employees retaliated against "because of lawful acts done by the employee ... in furtherance of an action under [the FCA] or other efforts to stop [one] or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1).

45. Accordingly, this protected activity is necessarily tied to the FCA's list of violations, which were written broadly with the aim of reaching all types of fraud that might result in financial loss to the United States. It identifies seven violations, any of which is a violation of the False Claims Act and triggers the FCA's whistleblower provision:

**(a)** LIABILITY FOR CERTAIN ACTS.—

**(1)** IN GENERAL.—Subject to paragraph (2), any person who—

 **(A)** **[False Claims]** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

 **(B)** **[False Records or Statements]** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

 **(C)** **[Conspiracy]** conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

 **(D)** **[Conversion]** has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

 **(E)** **[False Receipts]** is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

 **(F)** **[Unlawful Purchase of Government Property]** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

 **(G)** **[Reverse False Claims]** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government,

 or

 knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public

> Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

See 31 U.S.C. § 3729 (a) (emphasis added by structure).

46. The FCA punishes persons and employers — both civilly and criminally — who knowingly submit or cause someone to submit false claims to the government. For example, billing Medicaid or Medicare for services not rendered while knowing they were not rendered is a violation of the FCA.

## V.  CLAIM FOR RELIEF

### (WRONGFUL TERMINATION UNDER THE FEDERAL FALSE CLAIMS ACT IN RETALIATION FOR OPPOSING FEDERAL FUNDINGS FRAUD)

150. Under the Federal False Claims Act, an employee can be terminated for more than one reason, and an employee can prove wrongful termination if any of the reasons were illegal, and the termination would not have occurred without one or more illegal reason[s].

151. Plaintiff realleges each allegation set forth in the paragraphs above.

152. By reason of the foregoing, Defendant TTU wrongfully terminated Valcik in violation of the Federal False Claims Act by terminating him in whole or in part because Valcik opposed the TTU committing Federal funding fraud by violating the required and promised terms and conditions pledged by the City to obtain millions of dollars in ARPA funding.

153. Valcik has been injured by his wrongful termination and as a result should receive compensatory legal damages and equitable remedies, including but not limited to: back pay; double back pay; equitable reinstatement, if feasible, or front pay; and other compensatory damages or equitable relief that the Court finds just and/or right.

## VI.  JURY DEMAND

154. Although the Plaintiff seeks an equitable injunction of reinstatement or equitable front pay in the alternative, even cases with remedies sounding in equity, to the extent there are

one or more issues of fact or law suitable for a jury, the Plaintiff respectfully requests a jury trial on all such issues.

## VII.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Mark Valcik seeks relief against Defendants, as follows:

A.   That this matter be submitted to a trial by jury on all legal issues and as a bench trial for all issues of equity, and that Judgment be entered against all Defendants:

   a. Finding that that Defendant violated the Federal False Claims Act by terminating his employment, in whole or in part, because of he opposed Federal fraud in the form described above;

   b. Awarding direct financial damages and equitable relief, including back pay; equitable reinstatement or equitable front pay; loss benefits in the past and in the future; and/or the False Claims Act;

   c. Awarding liquidated damages in the form of double back pay under the False Claims Act;

   d. Awarding compensatory damages under the False Claims Act for Plaintiff's out-of-pocket expenses and other foreseeable financial harm;

   e. Awarding compensatory damages under the False Claims Act compensatory for Plaintiff's mental anguish, loss of enjoyment of life, suffering, and inconvenience; and/or

   f. Awarding attorney fees; costs of court, and all such other and further relief in law or equity as the Court deems to be just and right.

RESPECTFULLY SUBMITTED,

*/s/ Eric N. Roberson*

_____
Eric Roberson
Texas State Bar No. 00792803
Kilgore & Kilgore, PLLC
3141 Hood Street, Ste. 500
Dallas, TX 75204
214-379-0817 Direct
214.969.9099
214.379.0836 Fax
ENR@KilgoreLaw.com
**ATTORNEY FOR PLAINTIFF**