**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | | |
|---|---|---|
| **DR. NICOLAS VALCIK, PH.D.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO.  5:24-cv-00086-H** |
| | § | |
| **TEXAS TECH UNIVERSITY, NOEL** | § | |
| **SLOAN, AND BRANDON** | § | |
| **HENNINGTON.** | § | |
| | § | |
| *Defendants.* | § | |

**DEFENDANTS NOEL SLOAN AND BRANDON HENNINGTON'S MOTION TO
DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL
RULES OF CIVIL PROCEDURE 9(b) and 12(b)(6)**

TO THE HONORABLE U.S. DISTRICT JUDGE JAMES WESLEY HENDRIX:

Defendants, Noel Sloan ("Sloan") and Brandon Hennington ("Hennington")(collectively, the "Defendants" or "Individual Defendants"), respectfully request dismissal of Plaintiff's claim against them in Plaintiff's Third Amended Complaint (the "Complaint") pursuant to FED. R. CIV. P. 9(b) and 12(b)(6). Plaintiff's claim should be dismissed because Plaintiff has failed to state a claim for which relief can be granted.

### TABLE OF CONTENTS

Table of Contents ................................................................................................... 2

Table of Authorities ............................................................................................... 3

Introduction ........................................................................................................... 6

Background ............................................................................................................. 6

    I.    Factual Background ................................................................................ 6

        a.    The Integrated Postsecondary Education Data System
            ("IPEDS") ..................................................................................... 7

        b.    Title IV Eligibility and Funding ............................................... 11

Standard of Review ............................................................................................... 11

    I.    Fed. R. Civ. P. 9 .................................................................................. 11

    II.    Fed. R. Civ. P. 12(b)(6) ....................................................................... 12

Argument .............................................................................................................. 13

    I.    Plaintiff has Failed to Plead Fraud with Particularity as
        Required by Rule 9(b). ........................................................................ 13

    II.    12(B)(6)- Plaintiff Fails to Sufficiently Plead a Claim for
        Retaliation Under § 3730 (h). ........................................................... 18

        a.    Plaintiff did not engage in conduct protected under the
            statute ....................................................................................... 20

        b.    Plaintiff's own evidence establishes that Defendants could
            not have been on notice they were committing fraud
            against the Government. ........................................................... 24

        **c.**    Plaintiff has not established any alleged fraud would be
            "material" to the issuance of federal funds by the
            Government .............................................................................. 26

        d.    Plaintiff cannot establish that his termination, two years
            after he reported and corrected routine data, were
            tangentially related. ................................................................. 27

    III.    Alternatively, the Court should dismiss pursuant to Rule
        12(b)(1). .............................................................................................. 28

Conclusion ............................................................................................................. 28

Certificate of Service ............................................................................................ 30

<u>T<small>ABLE OF</small> A<small>UTHORITIES</small></u>

**Cases**

*Ackerson v. Bean Dredging LLC,*
589 F.3d 196 (5th Cir. 2009) ................................................................................... 19

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................ 13, 18, 19

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ...................................................................................... 12, 19

*Collins v. Morgan Stanley Dean Witter,*
224 F.3d 496 (5th Cir. 2000) .................................................................................. 23

*DiLeo v. Ernst & Young,*
901 F.2d 624 (7th Cir.) ........................................................................................... 13

*Fernandez-Montes v. Allied Pilots Ass'n,*
987 F.2d 278 (5th Cir. 1993) .................................................................................. 13

*Gentilello v. Rege,*
627 F.3d 540 (5th Cir. 2010) .................................................................................. 13

*Hutchins v. Wilentz, Goldman & Spitzer,*
253 F.3d 176 (3d Cir. 2001) ................................................................................... 16

*In re Katrina Canal Breaches Litigation,*
495 F.3d 191 (5th Cir. 2007) .................................................................................. 12

*Kaye v. Lone Star Fund V (U.S.), L.P.,*
453 B.R. 645 (N.D. Tex. 2011) .............................................................................. 23

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*
594 F.3d 383 (5th Cir. 2010) .................................................................................. 13

*Melder v. Morris,*
27 F.3d 1097 (5th Cir. 1994) .................................................................................. 13

*Nichols v. Baylor Research Inst.,*
418 F. Supp. 3d 143 (N.D. Tex. 2019) ................................................................... 25

*Norris v. Hearst Trust,*
500 F.3d 454 (5th Cir. 2007) .................................................................................. 13

*Robertson v. Bell Helicopter Textron, Inc.,*
32 F.3d 948 (5th Cir. 1994) .................................................................................... 27

*Turner v. Lieutenant Driver,*
848 F.3d 678 (5th Cir. 2017) .................................................................................. 22

*U.S. ex rel. Schutte v. SuperValu Inc., and U.S. ex rel. Proctor v. Safeway, Inc.,*
598 U.S. 739 (2023) ............................................................................................... 14

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
125 F.3d 899 (5th Cir. 1997) .................................................................................. 17

*United States ex rel Graves v. ITT Educ. Servs., Inc.,*
284 F.Supp.2d 487 (S.D. Tex. 2003) ..................................................................... 20

*United States ex rel. Doe v. Dow Chem. Co.,*
343 F.3d 325 (5th Cir. 2003) .................................................................................. 20

*United States ex rel. Gross v. AIDS Research Alliance–Chi.,*
415 F.3d 601 (7th Cir.2005) ................................................................................... 14

*United States ex rel. Grubbs v. Kanneganti,*
   565 F.3d 180 (5th Cir. 2009) .............................................................. 12, 14
*United States ex rel. Jackson v. Ventavia Rsch. Grp., LLC,*
   2024) ....................................................................................................... 20
*United States ex rel. Reddell v. DynCorp Int'l, LLC,*
   No. 1:14-CV-86, 2019 WL 12875471 (E.D. Tex. Mar. 20, 2019) ........................... 21
*United States ex rel. Willard v. Humana Health Plan of Texas Inc.,*
   336 F.3d 375 (5th Cir. 2003) .................................................................... 17
*United States v. Columbia Healthcare Corp.,*
   No. Civ. A. H-98-861, 2005 WL 1924187 (S.D. Tex. Aug.10, 2005)....................... 20
*United States v. Southland Mgmt. Corp.,*
   326 F.3d 669 (5th Cir. 2003) .............................................................. 16, 21
*Universal Health Servs., Inc. v. Escobar,*
   579 U.S. 176 (2016) .............................................................. 14, 21, 22, 25
*Venture Assocs. Corp. v. Zenith Data Sys. Corp.,*
   987 F.2d 429 (7th Cir. 1993) ...................................................................... 23
*Weaver v. United States,*
   298 F.2d 496 (5th Cir. 1962) ...................................................................... 22
*Williams v. WMX Techs.,*
   112 F.3d 175 (5th Cir. 1997) ...................................................................... 13
*Zepeda v. Hamilton Ins. Grp., Ltd.,*
   No. DR-22-CV-00057-AM-MHW, 2023 U.S. Dist. LEXIS 174342 (W.D. Tex. Sept.
   27, 2023) ............................................................................................... 19

**Statutes**
20 U.S.C. § 1094(a)(17) ..................................................................................... 9
31 U.S.C. § 3729(a)(1) ....................................................................................... 14
31 U.S.C. § 3729(a)(1)(A) ................................................................................... 21
31 U.S.C. § 3729(a)(1)(B) ................................................................................... 21
31 U.S.C. § 3729(b)(1)(A)(i)–(iii).................................................................... 14, 25
31 U.S.C. § 3729(b)(4) ....................................................................................... 14
31 U.S.C.§§ 3729(a)(1)(A), (B), (C), (G) .................................................. 14, 20, 24

**Rules**
Fed. R. Civ. P. 12(b)(6).............................................................................. 12, 16, 18
Fed. R. Civ. P. 8(a)(2)................................................................................... 12, 19
Fed. R. Civ. P. 9(b) ...................................................................................... 12, 13
Fed. R. Evid. 201(b) ............................................................................................ 22

**Other Authorities**
Alexandra Hegji, Cong. Research Serv., R43159, Eligibility for Participation in Title
   IV Student Financial Aid Programs (updated October 16, 2024), available at
   https://www.congress.gov/crs-product/R43159...................................................... 11
Federal Student Aid, *Annual Fines Report, for the Fines Imposed by Federal
   Student Aid in Fiscal Years 2010-2023*, available at https://studentaid.gov/data-
   center/school/fines-and-finding............................................................................ 24

Federal Student Aid An Office of the U.S. Dep't of Edu., *Application and Verification,* https://fsapartners.ed.gov/financial-aid-delivery/application-and-verification.................................................................................................... 11

Federal Student Aid An Office of the U.S. Dep't of Edu., *Calculating Awards and Verification,* https://fsapartners.ed.gov/financial-aid-delivery/calculating-awards-and-packaging ....................................................................................... 11

National Center for Education Statistics, *About IPEDS,* https://nces.ed.gov/ipeds/about-ipeds .................................................... 7, 8

National Center for Education Statistics, *IPEDS Survey Components,* https://nces.ed.gov/ipeds/survey-components.......................................... 8

National Center for Education Statistics, *IPEDS Survey Methodology,* https://nces.ed.gov/ipeds/survey-components/ipeds-survey-methodology 8, 9, 10, 11

https://studentaid.gov/data-center/school/fines-and-finding...................... 24

## INTRODUCTION

Plaintiff's Third Amended Complaint (Dkt. 40) fails to state a viable claim under the False Claims Act ("FCA") because the activity alleged in the Complaint does not constitute protected activity under the FCA. Specifically, Plaintiff's allegations do not involve any false claims for payment or approval, nor does the Complaint contain any credible assertion of a false record or statement material to such a claim, as required by the statute. Accordingly, because the False Claims Act allegations set forth by Plaintiff do not properly plead fraud as required by Rule 9(b), and do not state a claim upon which relief can be granted under Rule 12(b) (6), this Court must dismiss Plaintiff's claim against Defendants Sloan and Hennington.

## BACKGROUND

### I.    Factual Background

For nearly two years, Plaintiff served as the Managing Director for the Office of Institutional Research ("IR") at Texas Tech University. The IR is tasked with providing university administration, staff, and faculty with strategic data in order to facilitate institutional planning. This mission can only be accomplished by providing relevant and accurate statistical data to the University community. Consequently, the accurate reporting of official numbers was an integral part of Plaintiff's duties as Managing Director.

Throughout the course of his employ, Valcik was responsible with providing statistical data to the highest-ranking officials within the University, including the University President. Reports generated by the IR were utilized for official and

unofficial purposes, both internally and externally, for things such as university marketing, administrative assessments, and strategic planning. In or around March of 2022, Chief Data Management Officer, Brandon Hennington, discovered discrepancies between multiple *internal* reports generated by the IR. After raising the issue with Plaintiff and others, Hennington learned that this was not the first-time concerns were raised over Valcik's reporting of inaccurate data. Moreover, as opposed to acknowledging his mistakes and correcting his errors, it was revealed that Valcik had a history of attempting to improperly cover up his mistakes, including by instructing at least one subordinate to alter existing reports to match his erroneous data. The discovery of his instruction to a direct report to alter official data and misrepresentation of the facts and circumstances surrounding his mistakes, resulted in a loss of trust and confidence that spread across the key university stakeholders that relied upon his office for accurate data. As a result, senior leadership expressed concerns over continuing to work with Valcik, stating they had no confidence in his ability to report accurately nor represent their interactions in an honest manner. Plaintiff's primary responsibility was to ensure the accuracy and integrity of all information stored or distributed by the IR. Because Valcik could no longer effectively perform the duties of his job, he was terminated.

    a. The Integrated Postsecondary Education Data System ("IPEDS")

IPEDS is the Integrated Postsecondary Education Data System.[1] "It is a

---

[1] National Center for Education Statistics, *About IPEDS*, https://nces.ed.gov/ipeds/about-ipeds (last visited, August 25, 2025).

system of interrelated surveys conducted annually by the U.S. Department of Education's National Center for Education Statistics ("NCES"). Essentially, IPEDS is "a large-scale survey that collects *institution-level* data from postsecondary institutions in the United States (50 states and the District of Columbia) and other U.S. jurisdictions."[2] "IPEDS gathers information from every college, university, and technical and vocational institution that participates in the federal student financial aid programs."[3] The central purpose of IPEDS data is to collect, analyze, and disseminate comprehensive statistics of U.S. postsecondary education to describe trends enrollment, staff, degrees earned, finances, supporting policy development, and assist parents and students in making college choices."[4]

There are eight (8) areas of data IPEDS collects through thirteen (13) "interrelated survey components about general higher education topics."[5] Institutions, such as Texas Tech University, submit data for three (3) reporting periods.[6] NCES "annually releases national-level statistics on postsecondary institutions based on the IPEDS data."[7]

As can be seen in the below collection table, the collection cycles are fall, winter, and spring.

---

[2] National Center for Education Statistics, *IPEDS Survey Methodology*, https://nces.ed.gov/ipeds/survey-components/ipeds-survey-methodology (last visited, August 25, 2025).

[3] National Center for Education Statistics, *About IPEDS*, https://nces.ed.gov/ipeds/about-ipeds (last visited, August 25, 2025).

[4] *Id.*

[5] National Center for Education Statistics, *IPEDS Survey Components,* https://nces.ed.gov/ipeds/survey-components (last visited, August 25, 2025).

[6] *Id.*

[7] National Center for Education Statistics, *IPEDS Survey Methodology*, https://nces.ed.gov/ipeds/survey-components/ipeds-survey-methodology (last visited, August 25, 2025).



When data is submitted by an institution, the Data Collection System ("DCS") begins a level of data quality control by automatically comparing the response to prior years to ensure the data is consistent.[8] Additionally, DCS compares data within survey components and if data is missing, or an institution "does not respond to a survey component, NCES conducts imputations and as a result, a complete database is available for analysis."[9]

Pursuant to the Higher Education Act (HEA) of 1965, as amended (20 U.S.C. § 1094(a)(17)), "the submission of data to IPEDS is mandatory for any institution that participates in or is an applicant for participation in any federal financial assistance program authorized by Title IV of HEA." Because participation is mandatory, for each IPEDS component, there is typically a response rate of nearly 100%.[10] "The IPEDS database is used as the principal sampling frame for other NCES postsecondary

---

[8] *Id.*
[9] *Id.*
[10] *Id.*

surveys."[11] Participating institutions are placed in the "College Navigator" search tool, which "is designed to help college students, prospective students, and their parents learn about admission requirements, programs of study, degrees offered, costs, graduation rates, and other characteristics of institutions that they may find helpful in selecting among postsecondary institutions."[12]

"NCES releases the annual data collection in two levels: provisional and final."[13] NCES conducts an exhaustive, 9-month review and quality control process after the reporting period ends and before releasing provisional data to the public.[14] "In the following collection year, institutions may revise their data should an error be detected by the institution. Institutions update their data through the IPEDS Prior Year Revision System and the incorrect provisional data is updated with the revisions."[15]

Each institution is responsible for having a 'keyholder" or IPEDS coordinator who is responsible for reviewing, at the very least, and inputting the institutional data.[16] "When available, each customized survey form contains preloaded data from previous years for easy reference and comparison purposes. Once the data are entered, either manually or through file upload, the keyholders run edit checks and resolve all errors before locking their data. Once locked, the data are considered submitted, regardless of if a coordinator has reviewed the submission."[17]

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*

The DCS includes automated edit checks to detect significant reporting errors by comparing current responses to prior year data.[18] When data fall outside expected ranges, survey respondents must confirm the response or explain the discrepancy.[19] IPEDS staff review data manually and confirm data responses with keyholders when necessary.[20]

For each of the thirteen (13) survey components, specific edit checks are in place.

   b.  Title IV Eligibility and Funding

Title IV refers to programs and funds authorized under Title IV of the Higher Education Act of 1965 ("HEA"), which provides students in pursuit of postsecondary education with federally funded financial aid. These funds are administered by the U.S. Department of Education and eligibility is determined on an individual basis by students completing Free Application for Federal Student Aid (FAFSA)."[21] Aid disbursements are awarded based on financial need.[22]

## STANDARD OF REVIEW

### I.    Fed. R. Civ. P. 9

Generally, "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] Federal Student An Office of the U.S. Dep't of Edu., *Application and Verification,* https://fsapartners.ed.gov/financial-aid-delivery/application-and-verification (last visited, August 25, 2025).Aid
[22] *Id.*; *see also,* Federal Student An Office of the U.S. Dep't of Edu., *Calculating Awards and Verification,* https://fsapartners.ed.gov/financial-aid-delivery/calculating-awards-and-packaging (last visited, August 25, 2025); *see also,* Alexandra Hegji, Cong. Research Serv., R43159, Eligibility for Participation in Title IV Student Financial Aid Programs (updated October 16, 2024), available at https://www.congress.gov/crs-product/R43159.

Fed. R. Civ. P. 8(a)(2). However, where fraud is alleged, the pleading standard is heightened. Fed. R. Civ. P. 9(b). Specifically, Federal Rule of Civil Procedure 9(b) dictates that Plaintiffs plead "with particularity" the circumstances surrounding the alleged fraud. *Id.* Complaints filed pursuant to the False Claims Act, such as this, must also satisfy the "heightened" pleading standard of Federal Rule of Civil Procedure 9(b). *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009).

## II.     Fed. R. Civ. P. 12(b)(6)

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see generally,* Fed. R. Civ. P. 12(b)(6). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 545 (citations, quotations, and brackets omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Katrina Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555).

The Court is not required to conjure up unpled allegations in order to save a complaint, and "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice . . .." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993); *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. When reviewing a motion to dismiss for failure to state a claim, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). However, "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

<u>**ARGUMENT**</u>

I.      **Plaintiff has Failed to Plead Fraud with Particularity as Required by Rule 9(b).**

The False Claims Act ("FCA") is not a generalized, broad-sweeping anti-fraud statute and does not impose liability mere regulatory noncompliance. To survive dismissal under Rule 9(b) a plaintiff must plead the circumstances constituting fraud with particularity—specifically, the "who, what, when, where, and how" of the alleged fraudulent conduct. Fed. R. Civ. P. 9(b); *Williams v. WMX Techs.*, 112 F.3d 175, 179 (5th Cir. 1997)(citing *Melder v. Morris*, 27 F.3d 1097, 1100 n.5 (5th Cir. 1994)(citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941, 112

L. Ed. 2d 312, 111 S. Ct. 347 (1990)).

The Fifth Circuit demands that claims arising under the FCA specifically identify a false claim *submitted for payment* and demonstrate that the governments payment was conditioned on that claim. *Grubbs*, 565 F.3d at 192 ("[u]nder all sections of the [FCA], the defendant must act with the purpose of getting a false claim paid by the Government."). Merely alleging false conduct or the regulatory noncompliance is insufficient because the Act targets fraudulent demands *for money* or property not generalized misconduct. *See* 31 U.S.C. § 3729(a)(1). Rather, to satisfy Rule 9, "[f]alse claim allegations must relate to actual money that was or might have been doled out by the government based upon actual and particularly-identified false representations." *United States ex rel. Gross v. AIDS Research Alliance–Chi.,* 415 F.3d 601, 604 (7th Cir.2005). Moreover, the Supreme Court has made clear that even a request alone is insufficient if the defendant did not have the request scienter and if the falsity at issue was not "material" to the Government's decision to pay the claim. *See* 31 U.S.C.§§ 3729(a)(1)(A), (B), (C), (G); 31 U.S.C. § 3729(b)(1)(A)(i)–(iii); *Universal Health Servs., Inc. v. Escobar*, 579 U.S. 176, 194 (2016); *U.S. ex rel. Schutte v. SuperValu Inc., and U.S. ex rel. Proctor v. Safeway, Inc.*, 598 U.S. 739 (2023). Materiality is defined under the FCA as "having a natural tendency to influence, or be capable of influencing, the payment of receipt of money or property." 31 U.S.C. § 3729(b)(4).

Thus, under Fifth Circuit precedent, and the express language of the FCA, the who, what, where, and when of a FCA allegation require the pleader to identify an

actual false claim, state with particularity how or why Government payment of money was conditioned on such a statement, make a showing of a specific payment of money by the Government that was conditioned on the false claim, and the persons engaging in the fraudulent activity. Of critical importance is a showing of an actual claim (as defined by the FCA) and resulting payment by the Government because it is the claim for payment that is actionable under the FCA, not the underlying fraudulent or improper conduct.

Despite four attempts, Plaintiff still fails to allege facts that meet this heightened pleading standard. *Compare* Dkt. 1, *with* Dkts. 10, 13, and 40.

Indeed, the FCA defines "claim" as:

[A] *any request or demand*, whether under a contract or otherwise, *for money* or property and whether or not the United States has title to the money or property, that—

[1] is presented to an officer, employee, or agent of the United States; or

[2] is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government

—

[i] provides or has provided any portion of the money or property requested or demanded; or

[ii] will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded....

*Id.* § 3729(b)(2)(A) (emphasis added).

Plaintiff has not alleged Defendants made any request or demand for payment. *See generally,* Dkt. 40. Instead, his Complaint is based on:

Page 15 of 30

- Allegations of inaccurate data on internal databases (Dkt. 40 at ¶8);

- conclusory and generalized assertions of third-parties' alleged intent to defraud the Government for the purposes of avoiding "embarrassment" to the University (Dkt. 40 at ¶9, 10, 21);

- Customary IPEDS automated returns of out-of-range data (Dkt 40 at Appx. A, B);

- Concession that said data was corrected during the customary correction period built into the IPEDS data retrieval, review, and publication process (Dkt. 40 at Appx A, B);

- Generalized notions that because Texas Tech University is a Title IV eligible institution, any finding of inaccurate data reported by the University to the NCES could amount to a *future* attempt to defraud the Government (Dkt. 40 at ¶10);

- Repeated elemental recitations that are directly contradicted by the factual assertions his Complaint. *Compare* Dkt. 40, *with* Appx. A, B; *see infra,* Section II, Fed. R. Civ. P. 12(b)(6).

Courts have repeatedly rejected such vague allegations as failing Rule 9's mandate for particularized pleadings. *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003) (en banc) (citing *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 184 (3d Cir. 2001) (noting that the FCA "was not intended to impose liability for every false statement made to the government")); *see also United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 380–81 (5th

Cir. 2003) (affirming the district court's finding that "[u]nder section 3729(a)(2), the plaintiff must identify both a false claim and a false record or statement made or used to get that false claim paid"); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (instructing the district court to consider the false statements prong *if* it determined that the relator properly alleged false claims).

It would appear Plaintiff believes he has satisfied the federal pleading standards, through these vague, contradictory, and conclusory allegations. Dkt. 40 at ¶11 ("One reason that Dr. Valcik was fired, in whole or in part, was because he had informed his superiors that the IPEDS information was inaccurate and that he was terminated, in whole or in part, because correcting the IPEDS information, which was required by the Federal government for Title IV money, was considered problematic by TTU."); ¶ 10 ("However, IPEDS files had been incorrectly reported to the Department of Education prior to Dr. Valcik's hire and likely would have been used to falsely seek Title IV funding in the future. Accordingly, Dr. Valcik's attempts were designed to prevent a fraudulent Federal grant filing, and thus were "protected activity" under the Federal False Claims Act."); ¶15 ("Because Defendants Sloan and/or Hennington would have rather filed false and unlawful requests for federal funds with false data than to embarrass themselves and the University President by correcting the data, Sloan and/or Hennington knowingly instructed and/or allowed the false data to remain, despite Valcik's protestations and corrective actions."). However, he does not tie the purported inaccuracies to a false claim presented to the United States, nor does he allege any specific payment conditioned on those submissions. To the contrary, his own pleading confirms that no actual false claim exists under the FCA. Dkt. 40 at

¶11 ("he was terminated… because *correcting* the IPEDS information[]…") (emphasis added); ¶14 ("Because *correcting* the IPEDS data was problematic… Valcik's… conduct to report improper data and *fix* it[.]")(emphasis added); Appx. 002 ("This should have been 442.6 which has now been *verified and submitted*."); App. 003, 009 ("The IPEDS HR Survey Fall 2019 has *now been successfully re-submitted* and locked as of October 9th, 2020.") (emphasis added); App.009 ("want to thank the staff in my department … working so hard to *ensure the accuracy* of the information *submitted* to the Department of Education for compliance purposes.")(emphasis added).

Critically, because a retaliation claim under Section 3730(h) requires a whistleblower to have engaged in "lawful acts done by the employee…in furtherance of an action under this section or other efforts to stop one or more violations" and he has not presented a showing of any such act, he has failed to plead with the type of particularity that Rule 9 demands and his claim must be dismissed.

## II.    12(B)(6)- Plaintiff Fails to Sufficiently Plead a Claim for Retaliation Under § 3730 (h).

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted . . .." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *accord Gonzalez v. Kay,* 577 F.3d 600, 603 (5th Cir. 2009).

"A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Accordingly, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of . . . entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, quotations, and alterations omitted); accord *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009). "Nor does a complaint suffice if it tenders 'naked assertion[s]'devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. That is, there must be "a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 555 n.3 (quoting Fed. R. Civ. P. 8(a)(2)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'shown' – 'that the pleader is entitled to relief." *Zepeda v. Hamilton Ins. Grp., Ltd.*, No. DR-22-CV-00057-AM-MHW, 2023 U.S. Dist. LEXIS 174342, at *6-8 (W.D. Tex. Sept. 27, 2023)(citing *Iqbal*, 556 U.S. at 679 (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

The *prima facie* elements of a retaliation claim under the False Claims Act are:

(1) the employee engaged in protected activity under the statute;
(2) the employer knew that the employee engaged in protected activity; and

(3) the employer discriminated against the employee because he engaged in
protected activity.

31 U.S.C. § 3730(h); *United States ex rel Graves v. ITT Educ. Servs., Inc.,* 284
F.Supp.2d 487, 510 (S.D. Tex. 2003), *aff'd,* 111 Fed. Appx. 296 (5th Cir. 2004); *see
also, United States ex rel. Jackson v. Ventavia Rsch. Grp., LLC*, 744 F. Supp. 3d 676,
693 (E.D. Tex. 2024).

In other words, to be entitled to relief, Plaintiff must show (1) he engaged in
protected conduct (*i.e.,* acts done in furtherance of an action under § 3730), and (2)
that he was discriminated against because of his protected conduct. *United States v.
Columbia Healthcare Corp.,* No. Civ. A. H-98-861, 2005 WL 1924187, at *12 (S.D.
Tex. Aug.10, 2005)(mem. op.) (citation modified). Plaintiff fails at every turn.

a.  Plaintiff did not engage in conduct protected under the statute

As outlined above, the FCA is not a catch-all statute. It is Plaintiff's burden to
plead factual content that sufficiently "allows the court to draw the reasonable
inference" that Defendants Sloan and Hennington are specifically liable for wrongful
termination under this specific statute. To do so, Plaintiff was required to plead more
than conclusory statements or blanket assertions of wrongdoing. The FCA "generally
permits the Government or a party suing on the Government's behalf to recover for
false claims made by the defendants to secure payment by the Government." *United
States ex rel. Doe v. Dow Chem. Co.,* 343 F.3d 325, 329 (5th Cir. 2003). The Fifth
Circuit has expressly rejected Plaintiff's assertion that the FCA is intended to cover
broad-sweeping fraud against the government, noting that the FCA "was not
intended to impose liability for every false statement made to the government."

*United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003) (en banc).

Under the statute, the FCA imposes liability on any person who either (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id*. § 3729(a)(1)(B)." Claims falling under 31 U.S.C. § 3729(a)(1)(A) are known as "presentment claims," whereas those falling under § 3729(a)(1) (B) are referred to as false record claims. *United States ex rel. Reddell v. DynCorp Int'l, LLC*, No. 1:14-CV-86, 2019 WL 12875471, at *4 (E.D. Tex. Mar. 20, 2019) (Crone, J.).

Here, Plaintiff asserts his presentment claim can be established by applying the implied certification theory. Dkt. 40 at ¶¶37-8 (citing *Escobar*, 579 U.S. at 180). While true that the *Escobar* court held that this theory can, "at least in certain circumstances," be a basis for liability, such circumstances are not present here. *Escobar*, 579 U.S. at 181. There, the Court stated that the specific circumstance in which liability can attach under this theory, is "when the defendant submits a claim for payment that makes *specific representations* about the goods or services provided but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement. In these circumstances, liability may attach if the omission renders those representations misleading." *Id*. (emphasis added). The Court went on to hold that "what matters is … whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id*.

Here, contrary to Plaintiff's assertion, no such fact pattern exists. Even under Plaintiff's more expansive theory, his cause of action still fails because as Plaintiff acknowledges, for liability to attach, it must first be established that the defendant made a request or claim for payment. Dkt. 40 at ¶37; *Escobar*, 579 U.S. at 180-1. No such payment or request was made, has been made, or was alleged to have been made and the FCA does not apply to a regulatory violation in the abstract. Interestingly, Plaintiff never address this required element of his theory but instead focuses on the "materiality" of the alleged false submission.

The only allegations Plaintiff makes are: (1) He identified false data submitted to the federal government in two IPEDS submissions; (2) He corrected the false data during the data quality control and inspection period; (3) These false reports, despite being corrected, *could* lead to *future* fraudulent requests for money; (4) Correcting the data would embarrass University stakeholders;  and (5) Two years *after* he identified discrepancies in the IPEDS data, he was terminated. His allegations fail the plausibility standard and each allegations loses its presumption of truthfulness, as they are either directly contradicted by the Complaint itself or publicly available information regarding data reporting, IPEDS, Title IV, and related funds, of which this court should take judicial notice.[23] For the allegations which this Court is

---

[23] Defendants request the Court take judicial notice of the relevant IPEDS and Title IV publicly available information, which is outlined in factual background section of this Motion. The Fifth Circuit has held that judicial notice may be taken of "[s]pecific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." *Turner v. Lieutenant Driver*, 848 F.3d 678, 692 n.63 (5th Cir. 2017) (quoting *Weaver v. United States*, 298 F.2d 496, 498–99 (5th Cir. 1962)); see also Fed. R. Evid. 201(b) (providing that a court may take judicial notice of an adjudicative fact "that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

required to accept as true, not a single allegation establishes the basic criteria necessary for a viable FCA claim and thus, his claim should be dismissed.

As discussed herein, Plaintiff's theory misunderstands how federal education funds operate. Title IV funds are distributed as federal student aid from programs administered by the U.S. Department of Education. *See supra,* Factual Background. These include direct subsidized and unsubsidized loans, grad plus loans, Pell grants, and others. *Id.* Importantly, funding is based on application for funds *submitted by individual students*. *Id.* Under this paradigm, it would seem that only a student could be found to defraud the Government for receipt of funds as they submit the data upon which funds are awarded and are the beneficiaries of such award.

Next, Plaintiff fundamentally misunderstands the interplay between IPEDS data and the award of Title IV funds. IPEDS is a statistical reporting system administered by the NCES. It is designed to describe and analyze trends in U.S. higher education covering enrollment, staffing, finance, and degrees— not to administer payment under Title IV. Institutions participate in IPEDS as a condition of eligibility to be considered a Title IV institution, but the data submitted does not trigger a request payment from the Government. Congress authorized Title IV of the Higher Education Act to provide financial aid *to students* pursuing post-secondary

---

The Fifth Circuit has "note[d] approvingly" that "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim.'" *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). According to the Fifth Circuit, "[i]n so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Id.* at 499. Stated differently: "for a document to be incorporated into the pleadings under this exception, it must (1) be attached to a defendant's motion to dismiss; (2) be referred to in the plaintiff's complaint; and (3) be central to the plaintiff's claims." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011).

education. Institutions are required to meet certain eligibility criteria to be recognized as a Title IV eligible institution—including accreditation, enrolling students with high school diplomas, and offering eligible degree programs. However, reporting data to IPEDS does not constitute submitting a claim for payment. Errors in such reporting may warrant internal correction but they do not, without more, rise to the level of an FCA violation.

Plaintiff alleges that failure to report accurate data constitutes fraud against the Government under the FCA by pointing to statutory language providing for fines against Institutions who are required but fail to submit data. Dkt. 40 at ¶22. It is true that FSA can impose fines on Title IV institutions for varying reasons, including failure to submit IPEDS data. However, a penalty against an institution for failing to report information is distinct from making potential submission errors and correcting those errors in the time, way, and manner contemplated by the IPEDS data submission process.[24] Moreover, a fine or threat of deeming the institution ineligible for Title IV status would be a disincentive to provide accurate IPEDS data, not an incentive to misreport.

> b. Plaintiff's own evidence establishes that Defendants could not have been on notice they were committing fraud against the Government.

Moreover, to be considered protected activity an employee's objective belief must concern fraud upon the Government. *See* 31 U.S.C.§§ 3729(a)(1)(A), (B), (C), (G);

---

[24] Defendants request the Court take judicial of the Institutions who have received fines between the fiscal years 2010-2023. *See* FSA's Annual Fines Report, for the Fines Imposed by Federal Student Aid in Fiscal Years 2010-2023 (available at, https://studentaid.gov/data-center/school/fines-and-finding) (last visited October 25, 2025).  Texas Tech is not one such Institution.

31 U.S.C. § 3729(b)(1)(A)(i)–(iii); *Escobar*, 579 U.S. at 194; *Nichols v. Baylor Research Inst.*, 418 F. Supp. 3d 143, 149-50 (N.D. Tex. 2019). Plaintiff's allegations however demonstrate that he had no such belief.

Similar to the case at bar, in *Nichols v. Baylor Research Institute*, this district analyzed the limited nature of the FCA, specifically as it relates to a Defendant's request scienter. There, the court acknowledged that for the notice and knowledge requirement to be satisfied, the Plaintiff must, at the time of the report, express specific concern that the Defendants are or could be defrauding the Government. *Id.* at 149 ("Yet, for a retaliation claim based on statutory noncompliance to be proper, a plaintiff needs to show that her decision to report the noncompliance *itself* was motivated by a concern that the noncompliance was defrauding the government."). Indeed, the court states that it was notable that "Ms. Nichols does not cite to any paragraph in the Complaint where she alleges that fraud against the government was her motivation. Ms. Nichols cites to paragraph 17 of her complaint as establishing that she was concerned that Baylor had submitted fraudulent claims for payment to the government. As Baylor points out, Ms. Nichols "does not allege that she reported" such concerns when she made her internal complaints to Baylor. Doc. 9, Def.'s Br., 9. Instead, as currently pled, these types of observations, which are common throughout the Complaint, are "after-the-fact conclusion[s]" about the alleged violations Ms. Nichols reported." *Id.* at 150.

Similarly, nothing in Valcik's reports mentions fraud, accuses Defendants or any other individual of committing fraud, or indicates that the impact would be fraud

Page 25 of 30

committed against the Government. *See generally,* Dkt 40. This is because he knows it is not. Specifically, in his reports concerning the corrections made to the IPEDS data, each report identifies the category and type of data (non-financial reports) containing errors. *See* App. 001-15. More importantly, however, is that each report contains an impact summary in which, Plaintiff repeatedly acknowledged that the inaccurate data, if left alone, could impact the University's public *ranking. Id.* Better yet, he states that the data as initially reported, could have a *negative* impact on such rankings. Specifically, Valcik's own analysis states "[t]he impact can have unseen positive impacts going forward on rankings by external entities as well as being evaluated by Carnegie during their assessment cycle for R1 universities. One of the main issues for this survey is the data for faculty to student ratio, which will impact another IPEDS report (Fall enrollment), as well as the Common Data Set, and every survey, which uses that metric for determining rankings." … "For Texas Tech University, the impact could potentially be an increase in survey rankings (e.g. U.S. News and World Report etc.), as well as other positive impacts that may not be realized for several years." Dkt. 40 at App.012-13. It is implausible that any University official would ask Plaintiff not to change data that would positively affect the University's public standing.

> **c.** Plaintiff has not established any alleged fraud would be "material" to the issuance of federal funds by the Government

As discussed herein, Plaintiff asserts that the alleged "fraud" identified in his reporting is material to the payment of funds because incorrect data could result in a fine or penalty against the institution. Dkt. 40 at ¶22. However, this is

Page 26 of 30

unsubstantiated, conclusory, and incorrect. The main purpose of IPEDS data is for institutional information to be analyzed, tracked, and disseminated publicly. The issuance of funds is not determined based on these inputs, but rather the specific data submitted by students in their FSA applications. The FCA's materiality standard is demanding. Even if the data IPEDS data were inaccurate, and even if it caused Texas Tech University maintain its Title IV eligibility where it otherwise wouldn't have— which for avoidance of doubt, Defendants dispute—the specific errors would have no bearing on the Government's issuance of aid to student, as payments are issued based on the data submitted by each individual student. Accordingly, Plaintiff cannot establish that even if his allegations of fraud were considered protected under the FCA, such fraud would be material to the Government's decision to issue payment.

      d.  Plaintiff cannot establish that his termination, two years after he reported and corrected routine data, were tangentially related.

To prove that discrimination "because of" conduct in furtherance of an action under § 3730, Plaintiff must show that:

(1) his employer had knowledge he was engaged in "protected conduct"; and
(2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in "protected conduct."

*Id.; Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d 948, 951 (5th Cir. 1994). Thus, it is Plaintiff's burden to plead factual content that sufficiently "allows the court to draw the reasonable inference" that Defendants are specifically liable for wrongful termination. To do so, Plaintiff was required to plead more than conclusory statements or blanket assertions of wrongdoing. Assuming for sake of argument that Plaintiff was able to establish that he engaged in activity protected under the FCA,

he has not alleged a single, non-conclusory allegation that this act was the basis for his termination. Accordingly, his claim against Defendants Sloan and Hennington must be dismissed.

Alternatively, his claim against Defendant Hennington must be dismissed because his allegations utilized to establish Hennington had knowledge of his protected activity are contradictory, at best. Specifically, Plaintiff admits that it was another high-ranking university official not Hennington who received the data reports in question and it was the former Vice Provost who allegedly instructed him not to correct the data. These reports were made and corrected two years before Plaintiff was terminated and well over a year before Hennington became Plaintiff's supervisor. It is implausible that Hennington knew of any actual or attempted fraud or that it had any bearing on a decision to later terminate Plaintiff.

## III.   Alternatively, the Court should dismiss pursuant to Rule 12(b)(1).

On July 21, 2025, this Court issued an order denying Defendants' Motion to Dismiss pursuant to 12(b)(1), granting Plaintiff's Motion for Leave to Amend, and denying as moot Defendant's motion to dismiss pursuant to Rule 12(b)(6). Because the Court has already issued its ruling on Defendants Rule 12(b)(1) motion, Defendants will not burden the Court with rebriefing these arguments. However, Defendant asserts the grounds raised in its Second Motion to Dismiss as if fully incorporated herein.

### CONCLUSION

For the reasons stated above, Defendants Sloan and Hennington respectfully ask that the Court dismiss Plaintiff's claim with prejudice, and to all other relief to which they are entitled.

Dated: August 25, 2025.                    Respectfully submitted,

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

*/s/ Brianna Krominga*
Brianna M. Krominga
Texas Bar No. 24103252
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(214) 290-8884 / Fax (512) 320-0667
**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has served through the Court's Electronic Filing System on August 25, 2025, to the following:

Eric N. Roberson
Kilgore & Kilgore, PLLC
3141 Hood Street, Ste. 500
Dallas, TX 75204
ENR@Kilgorelaw.com
**Attorney for Plaintiff**

/s/ *Brianna M. Krominga*
Brianna M. Krominga